**Paul Eugene GRUBB, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–74–544.**

Court of Criminal Appeals of Oklahoma.

March 19, 1975.

W. G. "Gil" Steidley, Jr., McAlester, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., Jahn D. Rohrer, Legal Intern, for appellee.

OPINION

BUSSEY, Judge:

Appellant, Paul Eugene Grubb, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Pittsburg County, Case No. F–73–199, for the offense of Escape From the State Penitentiary. His punishment was fixed at a term of five (5) years in the State penitentiary, and from said judgment and sentence a timely appeal has been perfected to this Court.

At the trial Roby Battles, Assistant Records Clerk at the State penitentiary, testified that the defendant was committed to the Oklahoma State penitentiary on July 21, 1971, for a conviction of Robbery, to serve a term of ten (10) to fifty (50) years. According to the records kept by him, the defendant did not have permission to leave the custody of the State penitentiary during the months of July and August of 1973.

Park Anderson, Chief of Security Board Department of Corrections, testified he was employed as Warden of the Oklahoma State penitentiary during the months of July and August of 1973. He did not give the defendant permission to leave the prison. Anderson further testified that only the Warden or Deputy Warden had the authority to give permission to leave the penitentiary. If neither the Warden nor Deputy Warden were there, whoever was in charge could give permission to leave the prison.

Sam Johnston, Acting Warden, testified he was Deputy Warden during the months of July and August of 1973. He did not give the defendant permission to leave the custody of the prison in July or August of 1973. He further testified that a hole was cut in the fence on the east side of the industrial area to permit the defendant to escape. A hole had been dug underneath the dock of a warehouse to permit concealment

of prisoners; and a brick hammer, masonry hammer, crescent wrench, wet cell battery, seven gallons of water, and a loaf of bread were found in the hole. The sulfuric acid from the battery would keep the dogs from finding a prisoner in concealment.

Jim Smith, Agent for the Oklahoma State Bureau of Investigation, testified he picked up the defendant in Pecos, Texas, and returned him to the Midwest City jail.

The State then rested.

M. M. Gray testified for the defendant that he was a correctional officer at the State penitentiary on July 27, 1973. He was acquainted with the defendant. The defendant was a good worker and never gave him any trouble. While working as a guard at the State penitentiary, he heard the defendant had been threatened for refusing to participate in the riot.

Robert McConnell, an inmate, testified that he saw some "unnamed" imates threaten defendant because he would not participate in the riot. He further testified that when the defendant attempted to leave the main grounds of the penitentiary to go to the industrial area he and the defendant were turned back by some "dudes" with knives. He later saw the defendant get into the protected area by going over the wall.

Donald G. Richardson, another inmate, testified that while inside the industrial area, he told the defendant that if he went back inside the walls he would be killed. Inmate Richardson further testified that the inmates in the industrial area were told they would not have to go back inside the prison.

John Davis, inmate, then testified that he was in his cell with stomach pains which turned out to be an appendicitis attack. He further testified that some of the rioting inmates came to him and started to assault him because they thought he was faking an illness as an excuse for not participating in the riot. He then testified that the defendant intervened on his behalf in an attempt to get the men to leave him alone and was attacked himself.

The defendant then took the stand and testified he had been incarcerated in California prior to coming to Oklahoma. He left there as a parolee and, as a result of his being convicted in Oklahoma while still on parole in California, was a parole violator. He further testified that before the riot he worked in the prison as a barber, volunteer fireman, and worked in the leather shop. Defendant further testified he believed the inmates who threatened his life would kill him if given a chance. When he attempted to get into the industrial area where he would be safe, he was stopped by other inmates with knives. The defendant did finally manage to get into the industrial area by climbing over the wall. At this time he had no plans of attempting to leave the institution. However, when he found he was going to be forced to go back inside the prison, the defendant decided to return to California. He testified his purpose was to return to California and turn himself in to his parole counselor and to "do his time" in that state as a parole violator.

On cross-examination by the State, the defendant admitted staying in a hole dug in the industrial area for approximately seven hours with two other prisoners. The defendant left the grounds through a hole cut in the fence in the industrial area. Defendant further testified he did not leave the prison until one week after the alleged threats. The defendant also testified he was arrested in Pecos, Texas.

Defendant's first proposition asserts that it was error for the trial court to refuse to give his requested instructions on the defense of involuntary escape. The defendant's requested instructions are as follows:

"In this case the defendant as a part of his defense says that at the time of the difficulty he, the said defendant, was justified in doing as he did; he was acting in his necessary self-defense to protect himself from an unlawful attack of

his adversary, and when a person is unlawfully threatened in such a manner as to induce in him a reasonable belief that he is in danger of losing his life, or of suffering great bodily harm, he should at the time use all reasonable means, apparent to a reasonable person under the circumstances, to avoid such danger, before injuring any person. It is not necessary for this defense that the defendant's danger should have been actual or real; all that is necessary is that this defendant, from his standpoint and under all the circumstances in the case, had reasonable cause to believe, and did honestly believe, there was imminent danger to his life or of great bodily harm being done to him, and in determining whether or not the defendant acted in his own necessary self-defense, you shall view the circumstances as they then existed from the standpoint of the defendant, and viewing the circumstances from that standpoint, you shall determine whether or not he was acting reasonably in his own necessary self-defense.

"Should you find from the evidence in this case that the defendant acted in his own necessary self-defense, or should you entertain a reasonable doubt thereof, you should give the defendant the benefit of such doubt and acquit him."

Instead of these instructions the court gave the following instructions:

"You are instructed that it is no defense to a charge of ESCAPE that the prisoner feared violence from third persons, and you shall not consider such evidence as a defense or in mitigation of punishment."

In support of this assignment of error defendant cites the case of People v. Wester, 45 Cal.Rptr. 114 (Cal.App.1965), which was vacated but recited in People v. Wester, 237 Cal.App.2d 232, 46 Cal.Rptr. 699. A factually analogous case to the instant case is Chester v. State, Okl.Cr., 485 P.2d 1065 (1971), wherein at Chester's trial he admitted his absence and that he departed lawful custody; but the reason he departed

custody was because he had been in fear of his life over a money debt to another inmate. After conviction and on appeal, *Chester* cited People v. Wester, supra, as did the defendant in the instant case, in support of his defense of involuntary escape. In this regard, this Court stated:

"Defendant raised the defense of involuntary escape or escape under duress and on appeal cites in support People v. Webster (sic), 45 Cal.Rptr. 114 (Cal.App.1965). That case in considering a defense of involuntary escape because of the prisoner's fear for his life held:

" 'While the contemplation of such an eventuality strains the imagination, such a situation might possibly arise; but, if so, the prisoner who was thus escaping against his will would owe a duty to use reasonable efforts to render himself again into the custody of the law enforcement agency at the first available opportunity. The instruction states good law; it was properly given in the circumstances.'

"We observe that the instruction used in People v. Webster, supra, at page 117, *would be appropriate under a proper fact situation.*" (Emphasis ours)

Also in the case of State v. Alberigo, 109 Ariz. 294, 508 P.2d 1156 (1973), the Arizona Supreme Court, in ruling on an analogous set of facts as in the instant case, rejected Alberigo's requested instructions on the defense of involuntary escape and stated in the opinion at page 1158 and 1159:

"The instruction requested by defendant was taken from People v. Webster, 237 Cal.App.2d 232, 46 Cal.Rptr. 699 (1965), in which the defendant claimed his companion threatened to kill him if he would not go along. The facts distinguish this case from the instant case and the instruction is only applicable in the specific circumstances of that case.

"[1] It is well settled law that conditions in a prison afford no justification for escape. People v. Richards, 269 Cal. App.2d 768, 75 Cal.Rptr. 597 (1969); State v. King, 372 S.W.2d 857 (Mo.1963),

solitary confinement; People v. Miller, 196 Cal.App.2d 171, 16 Cal.Rptr. 408 (1961), fear of prison officers; State v. Palmer, 6 Terry, Del., 308, 72 A.2d 442 (1950), bad food, brutal guards, recreation, education and medical attention inadequate; People v. Whipple, 100 Cal. App. 261, 279 P. 1008 (1929), intolerable living conditions and brutal and inhuman treatment by guards; State v. Cahill, 196 Iowa 486, 194 N.W. 191 (1923), cell infested with bugs, worms and vermin, and without bed or chair, unhealthy, food consisting of an inadequate supply of bread alone; Johnson v. State, 122 Ga. 172, 50 S.E. 65 (1905), escape from Georgia chain gang to avoid unmerited punishment by guards; Hinkle v. Commonwealth, 23 Ky.Law Rep. 1988, 66 S.W. 816 (1902), fear on the part of prisoner in custody of sheriff of being shot by a third person; State v. Davis, 14 Nev. 439, 33 Am.Rep. 563 (1880), condition of jail filthy, loathsome and vermin infested; see also 70 A.L.R.2d 1430 at 1452–1453."

It is therefore our opinion that under the facts of the instant case and the authority cited above the trial court properly rejected the defendant's requested instructions and the instructions given by the trial court were proper.

Defendant's second proposition asserts improper cross-examination of the defendant by the State. The record reveals that after the defendant admitted leaving the penitentiary without permission, the District Attorney on cross-examination examined the defendant in detail on how he escaped. Defendant now contends that this was improper. In the case of Hopkins v. State, 9 Okl.Cr. 104, 130 P. 1101 (1913), this Court stated in Syllabus 4:

"On cross-examination of a witness, as a general rule, the party cross-examining should be confined to the matters concerning which the witness has been examined in chief, but this rule should be liberally construed so as to permit any question to be asked on cross-examination which reasonably tends to explain, contradict, or discredit any testimony given by the witness in chief, or to test his accuracy, memory, veracity, character, or credibility. This must necessarily include impeaching questions, although they may relate to matters independent of the questions testified to in chief."

Based on the above rule, it is our opinion that the questions asked defendant by the District Attorney on cross-examination were proper and did not prejudice the defendant.

It is therefore our opinion that the judgment and sentence appealed from should be, and the same is hereby, affirmed.

BRETT, P. J., and BLISS, J., concur.