Earl Eugene HOLMES, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–76–460.

Court of Criminal Appeals of Oklahoma.

Aug. 19, 1977.

Rehearing Denied Sept. 6, 1977.

Jack B. Sellers, Sapulpa, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., James W. McCann, Legal Intern, for appellee.

OPINION

BRETT, Judge:

Appellant, Earl Eugene Holmes, hereinafter referred to as defendant, was charged by information in Case No. CRF–75–66, with the crime of Knowingly Concealing Stolen Property, in the District Court, Creek County, in violation of 21 O.S.1971, § 1713. Defendant was tried by jury and represented by counsel. The jury returned a verdict of guilty, assessing punishment at eighteen (18) months in the State penitentiary. From said judgment and sentence a timely appeal has been perfected to this Court.

The following facts were established at the trial. On May 7, 1975, a model SBE Cortez CB radio worth about $180.00 was stolen from a Charles William Knot's automobile in Tulsa, Oklahoma. Acting upon a telephone tip, on May 24, 1975, two Creek County Deputy Sheriffs went to the home of the defendant. They saw him driving away and radioed a third deputy who located and stopped the defendant. The defendant voluntarily permitted the third deputy to search his camper pickup. In the rear of the camper the deputy found motorcycle parts, motorcycle keys, and various other items, including the SBE Cortez CB radio stolen from Knot's car. That deputy and the defendant went to the defendant's house, where they were joined by the first two deputies. There, the defendant was advised of his constitutional rights, whereupon he consented to a search of his garage. In plain view in the garage were several motorcycle frames and other items. One motorcycle was found with the serial number plate cut off, and the deputies noticed the smell of acetylene gas in the garage. The defendant asked not to be arrested until after the weekend was over, so he could work and make some extra money. The deputies agreed, and the defendant remained free until voluntarily surrendering himself on the following Tuesday. Later

that same evening, the defendant went to the Creek County Sheriff's Office where the deputies had taken the items found in the defendant's pickup and garage. Before proceeding with the inventory of those items, O'Dean Helm of the Tulsa Police Department advised the defendant of his constitutional rights. Waiving those constitutional rights, the defendant made a statement to Officer Helms identifying some of the items taken from his possession, saying about them that the man he had bought them from told him that if he did not later show up with the title for the items the defendant should just consider them to be "hot." As the officers were inventorying the items, the defendant told Officer Helm that he wanted to talk to him, at which time he requested that he not be booked until Tuesday. The officer replied that it was up to the Sheriff's Office to decide that, and that he again advised the defendant of his rights. Officer Helm told defendant that he was still entitled to those rights and asked him if he understood them, to which the defendant replied yes. Then, the officer asked him about the CB radio antennas, and the defendant replied, "well I thought at the time I bought them they was probably hot because I bought them so cheap."

The defendant called five witnesses, all of whom testified that they had been present with the defendant at a motorcycle shop in Tulsa, Oklahoma, on May 23, 1975, when a Mr. Ogglesbee had come into the shop and offered to sell some CB radios, motorcycle parts and other items. The defense witnesses testified that the defendant first examined the merchandise and then offered $475.00 for the entire lot. His offer was accepted and according to the witnesses a bill of sale was drawn and notarized. That bill of sale was offered into evidence by the defendant. Among those items was the SBE Cortez CB radio in question. All of the defendant's witnesses commented on the good price the defendant had gotten for those items. Defendant largely reiterated what the defense witnesses had stated. He further stated that he had purchased all the

items for $475.00, but the items were worth considerably more than that. Although he was unable to identify the seller, the defendant testified that he was able to pay for the purchase in cash because of a bike sale the day before. He testified that he ran a part-time motorcycle repair business and that he had purchased the parts because of his part-time business. The defendant denied that he had ever made a close inspection of the goods and further stated that he had not been suspicious by the low purchase price or by the conditions of the sale. He also said that he had neither checked to see if any of the items purchased worked, nor asked the seller if they worked.

As his first assignment of error, the defendant contends that his arrest was unlawful and that the items seized were the inadmissible fruit of an unlawful arrest or, in the alternative, the results of an invalid consent search; and that the trial court had erred in failing to sustain his motion to suppress.

Upon a careful review of the transcript it is apparent that at no time prior to May 27, 1975, was the defendant under arrest. As to the question of when an arrest becomes effective, this Court in *Hoppes v. State,* 70 Okl.Cr. 179, 105 P.2d 433 (1940), quoted 4 Am.Jur., Arrest, § 2, as follows:

" 'An arrest is the taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest. The act relied upon as constituting an arrest must have been performed with the intent to effect an arrest and must have been so understood by the party arrested. . . . However, in all cases in which there is no manual touching or seizure or any resistance, the intentions of the parties to the transaction are very important; there must have been intent on the part of one of them to arrest the other, and intent on the part of such other to submit, under the belief and impression that submission was necessary.' "

The record reveals that on May 24, 1975, Deputy Rippy received a telephone call from Cherokee, Alabama, the substance of which led the officers to look for the defendant. On direct examination, Deputy Rippy testified as follows concerning these events:

"Q. What did you do then?

"A. I pulled over in front of him [defendant] and confronted him with what information I had and asked him if I could look in his pick-up and he said yes."

 Both Deputy Rippy and Deputy Napier testified that the defendant voluntarily unlocked his garage so the deputies could inspect it. The defendant himself denied any arrest or any coercion or duress and advised that he had freely and voluntarily exhibited his property to the deputies:

"Q. I want you to tell the jury what took place, what was the conversation between you and Officer Rippy? Did you voluntarily open the camper?

"A. Yes I voluntarily opened the camper. Junior stopped me while I was getting ready to drive into town and he turned the light around and turned it on and so I pulled over to the side. . . .

\* \* \* \* \* \*

"Q. What did you do when you got down to your house?

"A. The best I remember when we got back down there Robbie and Graden and Roy Chastain were there. . . . they wanted to check that bike out, check the serial numbers and stuff and I said sure, fine and they checked it out and wanted to look in the garage so I opened the garage up and let them look in it."

It is apparent that no arrest was made when Deputy Rippy confronted the defendant on the roadside. Concerning this issue, Deputy Rippy testified that defendant told him he would work overtime and that he would voluntarily come to the Sheriff's Office after the weekend. He said the defendant had not been placed under arrest at

that time and that the defendant had come back in of his own free will after the weekend. Clearly, the defendant felt no restraint of his liberty:

"It was, I believe the following Tuesday I went down to the Sheriff's office to see what they had found out about everything and—well that Saturday night before they had checked, I'm pretty sure that they knew that the antennas had been reported stolen, so I says well, what are we going to do, you know, and they said well, we'd like to check the rest of it out, I believe O'Dean Helm said this, I believe he said we'd like to check the rest of it out and see how much is stolen, so that's when I said well, why can't I go ahead and go to work, you know, and come back down Tuesday and see what you find out and so I did come back down that Tuesday and that's when I found out this radio had been reported stolen. And I said well, what are we going to do, you know, and he says well, we are going to have to charge you so I got ahold of you, I believe it was."

The impression made on a person claiming to have been detained is of course a relevant factor to consider in determining whether or not he was arrested. In the instant case, no arrest was made until the CB radio was verified as having been stolen. This occurred on the following Tuesday when defendant voluntarily appeared at the Sheriff's Office. Defendant's motion to suppress is therefore without merit.

▮ In the instant case the seizure of the items from the defendant's truck and garage came about because of defendant's voluntary consent. Consent searches constitute an important investigative technique employed by law enforcement agencies. Such searches generally are conducted in informal or unstructured conditions whether at home or on the highway. The circumstances surrounding the initial request to search are a logical extension of investigative questioning. In *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–2048, 36 L.Ed.2d 854 (1973), the United States Supreme Court stated as follows:

"[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent. As with police questioning, two competing concerns must be accommodated in determining the meaning of a 'voluntary' consent—the legitimate need for such searches and the equally important requirement of assuring the absence of coercion.

"In situations where the police have some evidence of illicit activity, but lack probable cause to arrest or search, a search authorized by valid consent may be the only means of obtaining important and reliable evidence." (Footnote omitted)

Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.

▮ The defendant cites *Schorr v. State*, Okl.Cr., 499 P.2d 450 (1972), as authority for the proposition that the State needs to further show the voluntariness of defendant's consent and to require warnings. The *Schorr* case was explicitly overruled on the need for fullblown *Miranda* reading in these cases in *Rowbotham v. State*, Okl.Cr., 542 P.2d 610, 619 (1975). The record heretofore referred to shows defendant's consent was uncoerced and completely voluntary. Moreover, defendant was repeatedly advised of his *Miranda* rights. We are unable to find any evidence of coercive tactics, and the defendant's own testimony evidences his voluntary consent. The defendant was advised several times of his *Miranda* rights even though full exposure of such rights was not required. There is nothing in this case which would lead to the conclusion that the defendant's consent was anything

other than voluntary. For the above reasons we find this assignment of error to be without merit.

The defendant's second assignment of error alleges that the trial court erred in the admission of testimony concerning property other than the property described in the information. The information describes the following:

". . . One Cortez citizens band radio, serial number 44616950, model number SBE–21CB, black in color . . ."

At trial, the State presented evidence in effect that the above described radio had been stolen from its rightful owner in early May, 1976; and, was thereafter found in the possession of the defendant. Defendant's objection goes to the prosecutor's questions concerning a motorcycle frame, other CB radios, motorcycle fairings, and various motorcycle parts which were not included in the information. The defendant alleges that such questions were prejudicial. With this proposition we cannot agree.

We believe that *McCluskey v. State,* Okl. Cr., 372 P.2d 623, 631 (1962), is controlling in this issue. There, we held as follows:

". . . We need but call attention to the rule that evidence of separate and similar offenses is admissible when it is material and proper to show (1) Motive, (2) Intent, (3) Absence of mistake or accident, (4) Identity of the person charged with the commission of the crime for which an accused is put on trial, and (5) Common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other. . . ."

An examination of the exhibits shows defendant linked to each.

 In the instant case all interrogation relates only to property taken in the original theft. Throughout trial, defendant was questioned concerning whether or not he had examined the property, the extent of such inspection, and whether he had tested it for workability. Such examination was entirely proper in order to determine whether or not the goods were stolen. Moreover, the State need not prove actual

knowledge that the property was stolen as the defendant intimates, but need only show that the defendant had reasonable cause to believe them to have been stolen. See, *Richardson v. State,* Okl.Cr., 545 P.3d 1292 (1976). Thus, such interrogation was material in order for the State to show defendant's intent and knowledge. Furthermore, in *Dickey v. State,* Okl.Cr., 266 P.2d 480 (1954), in the fourth paragraph of the Syllabus we said:

"Evidence of the receipt of other stolen property by the accused at about the same time as the receipt of the stolen property charged in the information is admissible on the question of intent and guilty knowledge, where the charge is receiving stolen property."

The same holds true for the charge of concealing stolen property. The State introduced into evidence five exhibits. Exhibit No. 1 is of no dispute. Exhibit No. 2 was the subject of the charge. Exhibit No. 3 was a motorcycle part. Exhibits Nos. 4 and 5 were CB antennas. The deputy's testimony along with that of the defendant tends to support the proposition that defendant knew the antennas to have been stolen. Furthermore, the circumstances indicate that the motorcycle parts were likewise stolen. Since such evidence goes to the issues of intent, motive and knowledge, the lower court's action allowing the admission of such evidence was not erroneous. See, *Wilds v. State,* Okl.Cr., 545 P.2d 779 (1976). Therefore, we find this assignment of error to be without merit.

 As his final assignment of error, defendant alleges that the trial court erred in failing to give an instruction informing the jury of the limited purpose for which evidence of defendant's possession of other stolen property could be considered. The trial court's failure to deliver such an instruction was indeed error. See *Dickey v. State,* Okl.Cr., 266 P.2d 480 (1954), and *Wilkerson v. State,* Okl.Cr., 265 P.2d 739 (1954). However, defendant made no request for such a limiting instruction, and the error was raised for the first time on appeal. Therefore, defendant waived his

right to such an instruction. See inter alia, *Mathes v. State,* Okl.Cr., 552 P.2d 415 (1976).

For the above reasons, the judgment and sentence is *AFFIRMED.*

BUSSEY, P. J., concurs.